Dorothy Louise WARD, Administratrix of the Estate of William Ward, Deceased

v.

McDAN DAV LEASING CORPORATION et al.

DENNY LEASING COMPANY, Inc.

v.

McDAN DAV LEASING CORPORATION et al.

James B. VIBERT

v.

McDAN DAV LEASING CORPORATION et al.

v.

CELANESE COATINGS COMPANY et al.

Civ. A. Nos. 70–404, 70–405, 71–53.

United States District Court, W. D. Pennsylvania.

March 28, 1972.

Egler, McGregor & Reinstadtler, Pittsburgh, Pa., for plaintiffs.

Thomson, Rhodes & Grigsby, Baskin, Boreman, Sachs, Gondelman & Craig, Eckert, Seamans & Cherin, Meyer, Darragh, Buckler, Bebenek & Eck, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendants.

## OPINION AND ORDER

KNOX, District Judge.

INTRODUCTION: These three diversity cases all arising out of an accident which occurred on Interstate 70 in Washington County, Pennsylvania, on the evening of November 2, 1969, were consolidated for trial before the court non-jury. The court has heard the evidence and arguments of counsel, reviewed the briefs and requests of counsel for findings and conclusions and now enters the following Findings of Fact, Opinion and Conclusions of Law.

## A. FINDINGS OF FACT

1. The accident, which is the subject matter of this suit, occurred about 10:45 P.M. on Sunday night, November 2, 1969, on Interstate Highway 70 in Somerset Township, Washington County, Pennsylvania.

2. Interstate 70 at the place of this collision consisted of two eastbound and two westbound lanes divided by a concrete medial divider approximately one foot high and two feet wide.

3. At the time and place of the accident, Interstate 70 was dry, the weather was clear, it was dark and there was no artificial illumination other than the lights of passing vehicles.

4. One of the two vehicles involved in the accident was an eastbound Kenworth tractor pulling a van-type trailer, both owned by Denny Leasing Company and being operated by William Ward, the plaintiff's deceased.

5. William Ward was pronounced dead at the Montefiore Hospital at 7:55 A.M. on November 3, 1969. His death was due to injuries sustained by him in this accident.

6. Mr. Ward was born on December 24, 1927, was 41 years of age at the time of his death. He left surviving him his wife and Administratrix, Dorothy Louise Ward, a son Ricky, who is 11 years of age and a daughter, who is 15 years of age.

7. The amount in controversy exceeds the sum of ten thousand dollars exclusive of interest and costs of this action.

8. The plaintiff Dorothy Louise Ward is the duly qualified Administratrix of the Estate of her deceased husband William Ward, is a citizen of the State of Kentucky and has complied with the requirements of 20 P.S. Section 320.1101, having filed the appropriate affidavit with the Register of Wills of Allegheny County, Pennsylvania.

9. The corporate defendant McDan Dav Leasing Corporation, herein referred to as "McDan Dav", is and was at all times herein a corporation organ-

ized under the laws of the State of New Jersey, doing business in the Commonwealth of Pennsylvania and utilizing the roads, highways and streets thereof for this purpose. Its principal place of business is in New Jersey.

10. The defendant, David M. Tomlinson, herein referred to as "Tomlinson", is and was at all times herein a citizen of the Commonwealth of Pennsylvania.

11. The corporate defendant, herein referred to as "Mulach Steel" is and was at all times herein a domestic corporation being a citizen of and having its principal place of business in the Commonwealth of Pennsylvania.

12. The defendant, Tom Balistreri t/a Balistreri Haulers, herein referred to as "Balistreri", is and was at all times herein a citizen of the Commonwealth of Pennsylvania and at the time of the events in question was operating as a common carrier of property by motor vehicle pursuant to certificates granted by the Pennsylvania Public Utility Commission.

13. The defendant Ralph Stringert, herein referred to as "Stringert", is and was at all times herein a citizen of the Commonwealth of Pennsylvania.

14. The corporate plaintiff, Denny Leasing Company, Inc., herein "Denny Leasing", is and was at all times herein a corporation organized under the laws of the State of Kentucky and is a citizen thereof. Its principal place of business is in Kentucky.

15. Plaintiff in Civil Action No. 71–53, James B. Vibert, herein "Vibert", was at all times involved herein a citizen and resident of Kentucky.

16. Celanese Coatings Company, herein "Celanese", a corporation, third-party defendant and counterclaimant in Civil Action No. 71–53, was at all times involved herein a corporation of the State of Delaware with its principal place of business therein and was a citizen of Delaware.

17. All States Service Corporation, herein "All States Service", another third-party defendant in Civil Action No. 71–53 was a Wisconsin Corporation with its principal place of business in Wisconsin and a citizen of Wisconsin.

18. H.A.C. Farm Lines, herein "H. A.C.", also a third-party defendant in Civil Action No. 71–53, was a New Jersey Cooperative Association with its principal place of business in New Jersey and a citizen of New Jersey.

19. The tractor and trailer being operated by William Ward as set forth in Finding No. 4 had painted on it a symbol and letters making reference to "Celanese Coatings Company, Louisville, Kentucky" and the cargo therein was owned by Celanese Coatings Company, but William Ward was being paid by All States Service, Inc.

20. William Ward immediately before the collision was operating the tractor-trailer outfit described in Finding No. 4 in the "slow" or right hand eastbound lane of Interstate 70, and applying the presumption of due care applicable to a decedent under such circumstances, we find that he was operating in a careful and cautious manner at a reasonable rate of speed and within the speed limit of 55 miles per hour applicable at this point to vehicles of this type. He had no opportunity to avoid a collision when Tomlinson crossed into his lane and skid marks indicate he turned to the right and applied his brakes to no avail.

21. About 100–130 feet eastwardly from the place of the accident, which is the subject matter of the suit, and for some unknown period of time prior to said accident, a piece of steel, with welded angles and painted a dark red oxide color, was lying on or near the outside westbound lane of said highway.

22. Moments prior to the accident, which is the subject matter of the suit, Dorothy Chesnick, operating a Chrysler automobile in a westerly direction along Interstate Highway 70, did not see the aforesaid piece of steel and instead ran over it with the left wheels of the Chesnick automobile and thus both left tires of said automobile were cut and punctured and blew out.

23. Almost immediately after the Chesnick automobile had run over the said piece of steel, a Pontiac automobile, whose driver has not been identified, bearing a Kentucky license, also traveling west on Interstate 70, ran into or otherwise struck said piece of steel so that the gasoline tank of said Pontiac automobile was punctured and the car disabled by its gasoline leaking out of the gasoline tank through said tank puncture.

24. As the Chesnick automobile and the Pontiac automobile were gradually slowing down because they had been disabled when each had run over or otherwise had struck said piece of steel, a tractor-tanker, owned by the defendant McDan-Dav Leasing Corporation and operated by the defendant David M. Tomlinson which was also traveling west on Interstate 70, began to overtake the two said automobiles and the defendant Tomlinson pulled into the inside or passing westbound lane of Interstate Highway 70 in order to pass said two automobiles.

25. Immediately prior to these occurrences defendant David M. Tomlinson was operating a truck-tractor and empty stainless steel semi-trailer both owned by defendant McDan Dav Leasing Corporation and operated on their business by Tomlinson as their employee in a westerly direction on Interstate 70 following the Chesnick car and the Pontiac.

26. All three of the vehicles were traveling in the "slow" westbound lane of Interstate 70 at a speed of approximately 65 miles per hour. While Tomlinson claimed he was traveling at 50–55 miles per hour, we find from the testimony of Mrs. Chesnick and the other circumstances his speed was actually approximately 65 miles per hour, whereas the speed limit at this point applicable to vehicles of this type was 55 miles per hour. His headlights clearly illuminated the road 100 feet ahead of him.

27. Insofar as Tomlinson was exceeding the legal speed limit or was not able to stop within the range of his headlights such conduct is determined not to be the proximate cause of this accident.

28. The distance between the rear of the nearest automobile to the front of the tractor being operated by Mr. Tomlinson was approximately 400 to 500 feet. Prior to the slowing down of the Chesnick and Pontiac cars, Tomlinson had been following them at approximately the same speed and at the same distance.

29. The defendant Tomlinson did not see the piece of steel which at this time was located on the inside westbound lane of Interstate 70 and instead the left front steering wheel of the defendant McDan-Dav Leasing Corporation's tractor-tanker ran over or otherwise struck said piece of steel and the left front tire of said vehicle was cut and punctured and the left wheel rim was bent or dented.

30. The tractor-tanker owned by the defendant McDan-Dav Leasing Corporation and being driven by the defendant Tomlinson was not equipped with power steering. Accordingly, the forces set up by the sudden puncturing of the left front tire of said tractor-tanker caused said tractor-tanker immediately to swerve sharply to the left and become entirely uncontrollable. The said tractor-tanker, despite anything which the defendant Tomlinson could do or might have done, crossed over to its wrong side of the road and was headed for an open corn field located to the south of said Interstate 70.

31. The piece of steel in question was 6 feet 3 inches long, 10¼ inches wide, ¼ inch thick and weighed about 70 pounds. Welded to one side and projecting upwards were four angle irons 5⁄16 inch thick. It is in evidence as plaintiff's Exhibit 28 and bears the number S–1–J3798 through which it was traced to the defendant Mulach's plant. The piece is bent as the result of application of extreme force and one of the angle irons is badly bent. At various points,

it is discolored by a dark substance said to be rubber.

32. The piece of steel which was lying on the westbound lanes of Interstate 70 and was struck in turn by the Chesnick automobile, the Pontiac automobile and the tractor-tanker of the defendant McDan-Dav Leasing Corporation, driven by the defendant Tomlinson, because of its size, shape and color, the color of the highway surface and the darkness of the night was an unobservable, deceptive and camouflaged obstruction on Interstate 70 of a character or nature that a reasonable driver would not realize it was an obstruction and hazard to travel and highway safety until he was actually upon it and it was too late to avoid it.

33. The tractor-tanker of the defendant McDan-Dav Leasing Corporation, driven by the defendant Tomlinson, was suddenly and uncontrollably diverted from its intended course by the said unseen and unobservable piece of steel when said vehicle unexpectedly came upon said unobservable obstructing steel.

34. The impact with the piece of steel caused a blowout in his left front tire and after traveling some additional distance in the "fast" westbound lane, he turned into the eastbound lanes of Interstate 70 crossing the medial barrier.

35. The tractor-trailer being operated by Mr. Tomlinson crossed the medial divider and executed a left-hand turn in a southbound direction immediately in front of the tractor-trailer being operated by the plaintiff, William Ward, causing the Ward tractor to collide with the middle of the tanker being operated by Mr. Tomlinson.

36. The Tomlinson tractor detached from the trailer it was pulling and came to a rest below an embankment running along the southerly edge of Interstate 70.

37. The left front tire of the Tomlinson tractor was found in a damaged condition after impact giving evidence of having been cut.

38. Plaintiff James Vibert a co-employee of Ward at the time of the collision was asleep in a bunk in the tractor driven by decedent Ward which bunk was located behind the driver.

39. After the impact between the Ward and Tomlinson tractor-trailers, the steel plate marked S–1–J3798 with welded angles as described in Finding 30 was found on the north berm north of the westbound lanes of Interstate 70 at a point to the east of the area where the impact occurred.

40. The plate was fabricated by the South Hills Ornamental Iron Division of the Mulach Steel Corporation for the Gimbel's Department Store being erected in a shopping center near Lancaster, Pennsylvania, where it would have been incorporated into Stairway No. 1.

41. On viewing the piece of steel in the courtroom during the trial, Robert Miske, an employee of Mulach Steel Corporation testified that this piece of steel is referred to as either a closure plate or facia and it appeared to him to be damaged and we find this testimony to be true.

42. George Schaffer, also a Mulach Steel Corporation employee, testified that he saw this steel plate marked S–1–J3798 loaded onto a tractor-trailer owned by the defendant Tom Balistreri, as part of a bundle of steel items wired together and we find this testimony to be true.

43. Mulach Steel Corporation has two operating Divisions known as Mulfab Company which fabricates structural steel and South Hills Ornamental Iron Division which fabricates ornamental iron.

44. The Mulfab Division job number assigned to the Gimbel's project was 2702. The South Hills Ornamental Iron Division job number assigned to the Gimbel's project was J–3798.

45. The steel plate previously referred to as S–1–J3798 was manufactured by South Hills Ornamental Iron Division of the Mulach Steel Corporation prior to November 2, 1969. After being manufactured, the steel plate was stored

by the Mulach Steel Corporation .and loaded on a tractor-trailer owned and being operated by or in behalf of the defendant Tom Balistreri on the Mulach premises in Bridgeville, Washington County, Pennsylvania, on Friday evening, October 31, 1969.

46. The steel piece was loaded by Mulach employees using Mulach equipment and according to Mulach loading procedures. Items of steel bundled for shipment as described by the witness, George Shaffer, were referred to as "garbage" and "junk".

47. All of the steel fabricated by the South Hills Ornamental Division and the Mulfab Division of Mulach Steel Company, at its Bridgeville, Pennsylvania plant for the aforesaid Gimbel's Department Store was hauled from Bridgeville to Lancaster by the defendant Tom Balistreri, trading as Balistreri Haulers, a common carrier.

48. If banded or bundled with other small pieces of steel, Mulach employees had a duty to band or bundle the same securely and to notify Balistreri employees of the presence of this piece of steel not readily visible in a bundle so that the same could be safely secured.

49. It was the duty of Tom Balistreri and his employees prior to leaving the Mulach Steel Company premises with a load of steel to properly and to safely secure all items loaded by Mulach Steel Corporation upon Balistreri trucks.

50. After loading by Mulach employees, Balistreri employees checked the load and chained it down for safe transportation over the highways.

51. When Balistreri employees would chain down a load of steel, there never was any canvas utilized to secure small items such as the piece marked S–1–J3798 that may have been on the trailer and there was no barrier at the end of the trailer to prevent items from falling off, the trailer being a flatbed.

52. On the night of November 2, 1969, an employee of the defendant Tom Balistreri, trading as Balistreri Haulers, took possession of the aforesaid trailer,

loaded, inter alia, with the piece of steel marked "S–1–J3798", and after chaining said load down began the trip of hauling said load from Bridgeville to Lancaster, taking a route which would take him and the vehicle he was driving in an easterly direction along Interstate 70 toward the New Stanton interchange of the Pennsylvania Turnpike and past the scene of the accident which is the subject matter of this suit.

53. As the aforesaid load of steel was passing at or about the place of the accident, which is the subject matter of this suit, the piece of steel marked S–1–J3798 fell from the Balistreri trailer, on which it had been loaded and was being carried, and into the westbound lanes of Interstate 70 and the path of traffic traveling along said lanes.

54. The aforesaid piece of steel marked S–1–J3798 fell from said trailer on which it had been loaded because it was not properly loaded or chained down.

55. The defendant Tom Balistreri trading as Balistreri Haulers was negligent in failing to see to it that the said piece of steel marked S–1–J3798 was properly loaded and chained down so that it would not fall from said trailer and become an unobservable and deceptive obstruction to vehicles, including vehicles traveling in a westerly direction on Interstate 70.

56. The defendant Mulach Steel Company was negligent in loading said piece of steel marked S–1–J3798 in a manner that it could fall off the trailer on which it was loaded if the employees of Tom Balistreri negligently failed to observe that it was improperly loaded and so that it could slide or fall off and would not be securely chained by the load chaining.

57. The piece of steel marked S–1–J3798 found on Interstate 70 at the time of this occurrence was hauled by Tom Balistreri Haulers through his employees.

58. This same piece of steel was destined to arrive in Lancaster, Pennsyl-

vania, on the morning of November 3, 1969.

59. The Balistreri driver who inspected and chained down the load in question and departed with it on his truck for Lancaster, Pennsylvania, was defendant Ralph Stringert an employee of Balistreri acting in the course of his employment. It was from his vehicle that the piece of steel S–1–J3798 fell at or near the scene of the accident.

60. This piece of steel S–1–J3798 was the same piece of steel which was struck by the Chesnick car, the Pontiac car and the outfit driven by defendant Tomlinson and its presence in the westbound lanes of Interstate 70 was the proximate cause of this accident.

61. In the event of findings for the plaintiffs and/or cross or counterclaimants, the parties have stipulated to damages as follows: Dorothy Louise Ward, Administratrix of the Estate of William Ward, Deceased, $171,000; James B. Vibert $15,000; Celanese Coatings Company $3,000; Denny Leasing Company $27,000; McDan Dav $9907.00. These add up to the total sum of $225,907.

62. Insofar as minors and a decedent's estate have an interest in the Ward claim, the amount is approved. An order of distribution will be settled at a later date on petition of the parties.

## B. DISCUSSION AND OPINION

When confronted as here with a thicket of issues with multiple claims and crossclaims and each defendant attempting to foist liability upon another the only practical approach is to settle the issues of liability to the original plaintiffs first and then turn to the other claims and crossclaims. It should be observed that if all the arguments of defendants were adopted, plaintiffs, although obviously blameless, would wind up with a finding of liability against no one, thus categorizing this case as a pure accident resulting from an unforeseeable act of God. We will, therefore, discuss the liability of the defendants in turn.

1. Liability of McDan Dav and Tomlinson.

While there is some dispute in the record as to whether Tomlinson was an employee of McDan Dav, owner of the equipment he was driving, or of H.A.C. Farm Lines whose name was painted on the tractor, we do not have to determine these questions of vicarious responsibility since we find no legal liability on Tomlinson. .

■ We approach the question of Tomlinson's liability with what amounts to a factual presumption of negligence against him under Pennsylvania law which controls here. He admittedly crossed over the medial strip of Interstate 70 from his proper westbound lanes into the eastbound lanes directly into the path of Ward's oncoming vehicle resulting in this collision. In such case, Tomlinson has a heavy burden of explaining how he got into the wrong lanes of travel.

The basic Pennsylvania case is Campbell v. Fiorot, 411 Pa. 157, 191 A.2d 657 (1963), wherein the Pennsylvania Supreme Court finally reconsidered the law as to proof of liability against a driver who skidded into the wrong side of the road, which previously had been in some confusion. The court said:

"No matter how the defendant found herself in the wrong lane, she was where she had no right to be, and it was her obligation to explain what she was doing there, and how she got there."

\* \* \* \* \* \*

"When a motorist is on his right side of the highway, obeying all the rules of the highway, being careful, cautious and considerate of the rights of others, and suddenly he sees coming toward him, *like a gargantuan genie, a destroying force, it is not for him to explain how and why the invader got into his way.*"

\* \* \* \* \* \*

"———— But where, as here, the defendant's tractor-trailer appropriated both lanes of the highway, throwing

before the plaintiffs' decedents a *wall of body-crushing slate*, the plaintiffs had no obligation, in making out a *prima facie* case, to explain how and why this highway monopolization occurred."

Two years later in Blockinger v. Schweitzer, 419 Pa. 342, 214 A.2d 244 (1965), the court was confronted, as here, with a car on a four-lane highway leaping the medial barrier and colliding with oncoming vehicles in their proper lanes. The court there said:

"_____ There was a time when the word 'skidding' was a magic word and its mere pronouncement exonerated the driver of the skidding car from responsibility for the accident of which he was the author. That strange doctrine is now happily sepulchered for good.[1] The motorist who says that skidding caused his car to be operated in a wrong direction on that part of the highway where he has no right to be at all must show that he was as innocent of fault as a child riding a tricycle on the sidewalk outside the Sunday School from which he has just emerged.

"[1] The explanation of the defendant as to why he jumped the eight-inch medial barrier, even accepted in the light most favorable to his point of view, still leaves a great deal to be desired in establishing absence of negligence. He says that while driving 35 miles per hour on Route 51 in the inner or faster lane, a car on the outer or slower lane cut in ahead of him and, in the application of his brakes to avoid striking that car, he skidded. Since the accident happened in an area absolutely prohibited to him, he had the burden of proof of showing that he got there through no negligence of his own."

As the trier of the facts, we have viewed the evidence against Tomlinson in this light and concluded that this is one of those exceptional cases mentioned by the court and that he has sustained his burden of showing that he got into the opposing lanes through no fault of his own.

As a matter of fact, the evidence indicates that he was caught in an emergency situation not brought about by any negligence on his part in which he was powerless to act.

The evidence shows that the piece of steel would naturally blend into the pavement at night and that its presence on the pavement was indiscernible to both Mrs. Chesnick and Tomlinson and inferentially to the driver of the Kentucky licensed Pontiac. This brings it within the class of cases involving concealed or invisible obstructions in the roadway such as Fringer v. West York Borough, 421 Pa. 579, 220 A.2d 849 (1966) (hole concealed by water). This piece of steel with projecting angle irons when struck by the left front tire of Tomlinson's tractor immediately caused a great cut or tear in the tire as shown by the photographs and deflated the tire. This in turn caused Tomlinson to lose control and cross the medial barrier immediately in the path of decedent's vehicle resulting in this violent collision and death. For this, Tomlinson was in no way to blame. He had no power steering, but we are not prepared at this time to say that is negligence.

We have considered other possible acts of negligence on Tomlinson's part which may have contributed to this accident. We have concluded he was driving at approximately 65 miles per hour and not 50 to 55 as he testified. We have concluded this from reviewing his testimony in conjunction with that of Mr. and Mrs. Chesnick. They both agree they were traveling at 65–70 miles per hour (N.T. 21, 36) and Tomlinson was following them at a distance of approximately 500 feet (N.T. 71–73). The speed limit for Tomlinson's vehicle was 55 miles per hour (N.T. 68) but this violation of a speed statute or regulation would not make Tomlinson liable unless the violation of the statute was the proximate cause of the accident. Ennis v. Atkin, 354 Pa. 165, 47 A.2d 217 (1946). We have concluded that a speed 10 miles in excess of that permitted for trucks on this interstate highway was not the

cause of this accident and that even if Tomlinson had been traveling at 55 miles per hour, he would nevertheless have lost control and been diverted into the opposing lane.

We have also considered whether Tomlinson was traveling at such speed as to be unable to stop within the assured clear distance ahead or when a vehicle ahead slows or stops. Again, if there was such negligence on his part, there was no causal connection. In the first place, the assured clear distance rule does not apply to a camouflaged obstruction in the roadway. Colonial Trust Co. v. Elmer C. Breuer, Inc., 363 Pa. 101, 69 A.2d 126 (1949). The question is the inherent invisibility of the object. Koelle v. Philadelphia Electric Co., 443 Pa. 35, 277 A.2d 350 (1971). In the second place, there is no clear evidence that Tomlinson could not have stopped before striking the two cars ahead of him when they slowed down. (N.T. 76). Even if he could not have stopped, there was no reason for him not pulling to the left into the inside or passing lane to pass them since there was nothing to indicate to him that this lane was obstructed by the piece of steel.

We, therefore, find no liability on the part of defendants McDan and Tomlinson or on the part of third-party defendant H.A.C. Farm and judgments will be entered in their favor.

2. Liability of Balistreri and Stringert.

There was some indication that a Balistreri driver other than Stringert, viz: one Robert Staggers, Jr., might have been concerned in the movement of the load from which the piece of steel S–1–J3798 fell. Staggers has died since the hearing of this case on or about January 11, 1972. A suggestion of his death has been filed on January 31, 1972, but no substitution of a personal representative. Unless this is done within ninety days from January 31, 1972, the action against Staggers will be dismissed under Federal Rule of Civil Procedure 25(a) (1). In any event, we determine the movement was made by Stringert.

It makes no difference, however, which Balistreri driver was handling this movement, since according to the Findings and testimony all steel from Mulach to the Gimbel's construction site at Lancaster, Pennsylvania was moved by Balistreri trucks and Balistreri would be liable regardless of which driver transported the piece in question.

This brings into play as against Balistreri, a common carrier, the Pennsylvania doctrine of exclusive control which has many times been followed by the Pennsylvania Supreme Court. The best exposition in a case similar to this is found in Mack v. Reading Co., 377 Pa. 135, 103 A.2d 749 (1954) where a coupler broke off a car in a freight train, rolled onto a highway and a truck collided with it. The court said:

"———— Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

\* \* \* \* \* \*

"———— To require plaintiff to prove affirmatively the exact source of the accident would usually in cases of this kind defeat recovery, however gross the negligence, as the person injured seldom has means of either knowing or discovering absolutely the defect in equipment or delinquency on the part of employees, both of which are entirely within the control of the defendant. The doctrine of 'exclusive control' is designed to meet situations of that kind. It is not that negligence is presumed in such cases from the mere happening of the accident but that the circumstances amount to evidence from which it may be inferred by the jury."

\* \* \* \* \* \*

"———— There is a class of cases in which accidents are attended by circumstances from which the inference

of negligence is legitimate. But in such cases negligence is not a presumption of law. It is a finding of fact, and, before the fact can be found, a jury must consider the circumstances, reason on them, and draw the inference of negligence."

\* \* \* \* . \* \*

"——— In the present case the jury may not have believed the testimony offered by defendant's witnesses as to whether the inspection claimed had in fact been made, or, if made, whether with sufficient thoroughness, or whether the break in the coupler was at a point so far back from the end sill of the car that it would not have been possible to have seen it by proper examination."

In connection with Balistreri's liability see also Hurt v. Charles J. Rogers Transportation Co., 164 Ohio St. 329, 130 N.E. 2d 820 (1955) where forgings improperly boxed by the shipper fell off a truck and hit a passing car. The trucker was held liable on the basis of inferences from the fact that the forgings were made by the shipper and the Rogers outfit was the only one to leave the shipper's plant that day with forgings. The companion Hurt case at 130 N.E.2d 824 (appeal of Ford Motor Co.) will be discussed in connection with the liability of Mulach Steel.

Plaintiff also calls our attention to certain sections of the Pennsylvania Vehicle Code which are. operative in this area.

75 P.S. p. 381, Section 831—Sifting or Leaking Loads:

"No vehicle carrying inanimate contents shall be driven or moved on any highway unless such vehicle is so constructed or loaded as to prevent such contents from dropping, sifting, leaking or otherwise escaping therefrom." 75 P.S. p. 382, Section 831.1, Regulations as to Hold-Down and Tie-Down Devices:

"(a) It shall be unlawful to transport, by an open-body or stake-body motor vehicle, trailer or semi-trailer, over the highways within this State, any metal coils, ingots or pipes, unless such loads are secured by adequate and safe means."

While defendant Balistreri points out to us that these sections of the Vehicle Code are penal in nature, and impose no civil liability in so many words, nevertheless the same is true of many other sections of the Vehicle Code. For instance, the section about driving on the right side of the road (75 Purdon's Pennsylvania Statutes 1004) has attached to it only a penalty of $10 and costs for violation yet no one would claim that violation of this section would not give rise to a civil action for damages.

Section 831 was apparently enacted to protect the traveling public and users of the highway. Where violation of this section is the proximate cause of injuries, anyone injured thereby can sue.

The rule in Pennsylvania is clear that violation of a statute is negligence and is actionable if it is the proximate cause of injuries to one whom the statute is designed to protect either in whole or in part: Ennis v. Atkins, 354 Pa. 165, 47 A.2d 217 (1946) adopting Restatement of Torts Section 286.

However this may be, it is our opinion that Balistreri and his driver Stringert are clearly liable under Mack v. Reading Co., supra, and the exclusive control doctrine contained therein. While this gives a factual inference only, we see nothing in the exculpatory evidence offered by Balistreri to convince the trier of facts that he has carried his burden of proving himself without fault in inspecting this load and making sure it was adequately protected against falling or sliding off the truck when transported at high speeds over public highways with accompanying starts and stops and vibration. See Layton v. Palmer (Mo.1958) 309 S.W.2d 561, 66 A.L.R.2d 1242. At most, such evidence raises a question for the trier of facts and we decide against him.

Judgments will, therefore, be entered in favor of plaintiffs and against Balistreri and Stringert.

3. Liability of Mulach Steel Corporation.

Much of the testimony concerning the liability of Mulach is shrouded in mists of confusion apparently caused by the fact that Mulach officers had no actual knowledge that a piece of steel fabricated by their business had fallen off a truck and caused this accident until after the lapse of several months. See Mendel (N. T. 233–268). While subordinate employees knew that a piece of steel had been reported missing by the contractor at Lancaster and a substitute piece had been made, there was no record of this second fabrication. (N.T. 221). The delivery receipts and shipping lists whereby the shipments for Lancaster, Pennsylvania, were entrusted to Balistreri contain no reference to the piece of steel in question S–1–J3798. As previously mentioned there is some indication that the piece in question might possibly have moved as part of a load transported by Staggers (Bob) covered by Exhibits 16(A) and 16(B), the original of which is 16(X). This apparently included the whole shipment originally but the evidence is that when the shipment was loaded, Balistreri claimed the load was too high and too awkward and made them reload it (N.T. 276–284). As a result of this, certain pieces were taken off and put on another load which is covered by a shipping list, Exhibit 18. This was the load moved by Stringert on the evening of the accident November 2, 1969, which load was delivered as shown by the consignee's receipt, Exhibit 18, at Lancaster on Monday, November 3, 1969. There is no evidence that any other load moved on the evening of November 2, 1969, and, therefore, we must conclude that this piece of steel, Exhibit 28, moved on this load although it was not listed. It was admitted by Mendel, General Manager of the South Hills Ornamental Iron Division of Mulach, that their procedures were "slipshod" (N.T. 249).

It is unlikely that the piece in question would have been moved by any other load because, having fallen from the truck into the westbound lanes of Interstate 70, a heavily traveled interstate highway, it is improbable that it would have lain there for any length of time without causing other accidents or without being noticed and reported by others, particularly the State Police who regularly patroled the highway. We, therefore, conclude and find as a fact that this piece of steel was transported by defendant Stringert in load 38 covered by Exhibit 18. Regardless of this determination, it is clear that the piece of steel was loaded by Mulach on a Balistreri trailer and hauled by a Balistreri driver to the point of the accident.

As to exactly what occurred at the time of the loading, there is more confusion among Mulach employees caused by the lapse of time before anything was brought to their attention concerning this matter. We do, however, have one witness whose testimony is fairly clear on this matter, viz: George W. Shaffer, who describes himself as a fitter and one who fabricates steel at Mulach. While some of the parties attack Shaffer's credibility, nevertheless in view of the details he has given us in describing this steel and the reason why this piece did stand out in his memory, because he actually made a substitute for it, and from observation of him, we conclude that this witness is telling the truth and adopt his testimony. He told the court that he actually made Exhibit 28 and put it on a truck (N.T. 270–271). He specifically remembers making a substitute for this piece (N.T. 272) but states it was different because he did not put the bent plate on the second one and did not put a hole in the end of it because he did not know where the hole belonged (N.T. 272–273). He states he put it on a Balistreri truck by using a crane (N.T. 274) and then recalls that Balistreri required them to reload as mentioned above (N.T. 274–275). He says Balistreri told him to break it up into two loads and he is not certain whether, after rearranging the loads, it went out on the first trailer or on the second. However, at page 277, he testified:

"Q. Do you mean to be telling Judge Knox, Mr. Shaffer, that you recall

loading Exhibit No. 28 onto Tom Balistreri's trailer?

A. Do I recall loading it on?

Q. Yes, sir.

A. Yes.

Q. And this piece was loaded onto Tom's trailer; was it loose, like it is now, or was it attached to something else?

A. *It was tied into a bundle.*

Q. *What was in the bundle with it?*

A. *A stringer.*

Q. One stringer?

A. And hanger rods.

Q. *A stringer and hanger rods?*

A. Yes."

Considering this testimony as true, we therefore conclude that the piece of steel in question Exhibit 28 was tied in a bundle with other pieces of steel which bundling was accomplished by Mulach employees. It was then loaded by a Mulach crane on the trailer operated by Stringert. Stringert then chained the load down, left for Lancaster and the piece of steel in question slipped out of the bundle and fell to the pavement on Interstate 70 with the resulting catastrophe.

Shaffer is clear at page 279 that this bundle was held together by heavy wire. The number of wires used is not stated but he is certain he did not use steel bands (N.T. 279). Some attack is made on his testimony because witness Hall, who admitted they bundled small objects and that the piece of steel in question was too small to be loaded as a separate object (N.T. 467), stated at pages 471 and 472 that the company never used wire but always used steel bands. We must remember, however, that Mr. Hall was shop foreman and superintendent for Mulfab Division of Mulach and would not necessarily be acquainted with the bundling practices of the South Hills Ornamental Iron Division. Mr. Miske at N.T. 162 says that South Hills either banded or wired their material together and Hall at 473 expressed the opinion

that the use of wire for bundling was not safe.

As further evidence of the loose practices of Mulach in bundling and loading steel, we have the testimony of Miske at page 157 in which he described the shipment as follows:

"Well, it is a steel hand rail or plate or whatever the case may be, *just one pile of garbage wired together* so it can be picked up and put on the top of the load, just a plain old bundle, everybody calls it that, just *a bunch of scrap to me.* We don't usually handle this. We don't make it; let's put it that way."

Apparently Mulach paid no particular attention to the bundling of small pieces of steel such as this as to whether they were safe for transportation and whether the bundles were so secured that pieces such as this could not slip out. Balistreri's driver, Stringert, also failed to consider this possibility which could have easily been foreseen as a result of the vibrations of a truck driven at various speeds for seven or eight hours over expressways with accompanying starts and stops whereby the pieces could easily work loose.

Stringert testified at N.T. 304:

"Q. When fabricated—meaning put together, assembled—steel objects and loaded onto a trailer, is it your practice to go around and study the integrity of the fabrication, or do you assume it is all put together properly?

A. *I assume it is put together properly and loaded on the trailer properly.*"

Further, at page 312, he stated that it was only his intention to secure the bundle as a unit. In other words, we have a situation where the shipper relied on the carrier for safety and the carrier relied on the shipper, as a result of which neither lived up to the high standards of duty which they owed the public in connection with the movement of this piece of steel to Lancaster and the probable dire consequences resulting from any failure to perform such duty of which

the accident which is the subject of this litigation is sufficient evidence.

What is the legal liability of a shipper in this situation? With respect to the shipper, we do not have the support of the Pennsylvania Doctrine of Exclusive Control which we have heretofore applied to fasten liability upon Balistreri, although, as just pointed out, this statement by Stringert is sufficient to show actual negligence in the performance of the high duty of care which a motor carrier owes not only to its shipper but also to the public on the highways. See Dorris v. Bridgman & Co., 296 Pa. 198, 145 A. 827 (1929).

Mulach relies heavily upon the recent case of Hicks v. Unger Motor Co., 332 F.Supp. 118 (E.D.Pa.1971) wherein the court held that a shipper was not negligent where its only connection with the loading was the use of its crane to move coils upon a truck where they were bound down by the driver. The court (per Gorbey, J.) said: *"Without more, this would be sufficient evidence to contravene any allegation of negligent loading asserted against Metals (the shipper)."* No citations are given by the court to support its opinion but, in any event, this is a case vastly different from ours. If all we had in this case was a large steel beam loaded by Mulach on Balistreri's trailer and chained down by Stringert which came loose, the Hicks case would apply. But here we have a small piece of steel bundled by the shipper which small piece may or may not have been apparent to a truck driver. This bundling was here undertaken by the shipper.

While there are not too many cases in this area, the overwhelming majority hold that a shipper who loads a vehicle and whose loading or packaging is unsafe will be held responsible either alone or concurrently with the carrier for objects falling from a truck. Considering the fact that the shipper knows that the load is to be moved over public highways with accompanying danger to the general public, if the part of the loading which the shipper undertakes is not performed safely, it is obvious that the law must hold the shipper liable.

The leading case is Stalik v. United States, 247 F.2d 136 (10th Cir. 1957). In this case, the shipment was loaded by the government and the court determined that it was no part of the truck driver's duty to load or secure the loading. The metal objects were packed in metal bins which were deteriorated and rotten. They were loaded onto the truck by the government and bound down with chains by the truck driver. In the course of transportation, one of the boxes containing angle irons collapsed and a piece of angle iron was thrown from the truck just as plaintiff was passing in his automobile. It went through his windshield causing serious permanent injuries. The court held that the government owed a duty to the public to so load this material that it could safely be transported along the highway.[1] Similar cases are: Risley v. Lenwell (1954) 129 Cal.App.2d 608,

---

1. "It is without dispute that this heavy material was loaded in a haphazard and unsafe manner. It was loaded on this flat bed truck, in deteriorated rotten boxes, which when battened down was unsafe and liable to collapse, as this one box did, and scatter dangerous material along the highway. In fact, the court found that it could be reasonably anticipated from the manner in which this truck was loaded that what did happen might happen. The Government knew that this material would be transported along the public highway in this unsafe and dangerous manner. It participated in bringing about these conditions. It owed a duty to the public using the highway to so load this material that it could be safely transported along the highway. That duty did not cease when title to the property had passed to the puchaser and it had left the Government's premises, nor was the Government relieved from its duty to the public by the fact that Seiver also was negligent in not using side-boards. The uncontradicted evidence adduced by plaintiffs makes a prima facie case of negligence against the Government in loading or participating in the loading of this material in such a negligent manner. This liability to third persons continued even though Seiver was transporting the material along the highway at the time of the accident and the resulting injury."

277 P.2d 897; Richmond Concrete Products Co. v. Ward (1957) 95 Ga.App. 419, 98 S.E.2d 130; Carr v. Merrimack Farmers Exchange, Inc. (1958) 101 N.H. 445, 146 A.2d 276.

One case, seemingly to the contrary is Hurt v. Charles J. Rogers Transportation Co., 164 Ohio St. 323, 130 N.E.2d 824 (Ford Motor Co., appellant) (1955). We have heretofore cited the companion case at 164 Ohio St. 329, 130 N.E.2d 820 imposing liability upon the trucker. In the second case where the injured party also sought to impose liability upon the shipper, the Ford Motor Company, the court held that the conduct of the truck driver, who knew that the forgings were insufficiently packed in inadequate boxes and was aware that some of the boxes had broken and had already spilled forgings on the highway and who then in an inadequate and slipshod manner attempted to repair some of the boxes, and then continued on his way for approximately 40 miles when some more ingots came out of the boxes with resulting injuries to the driver of a passing car, constituted an intervening or superseding cause absolving the shipper from liability. The court assumed that there had been initial negligence on the part of the shipper in placing these forgings on the truck when improperly packed but held that the act of another agency (truck driver) which could or should have eliminated the hazard absolved the original agency (shipper) of liability.

An examination of the opinion indicates that the Ohio law of superseding cause is somewhat different from the Pennsylvania law in this area as laid down by the Pennsylvania Supreme Court in the classic case of Kline v. Moyer (per Chief Justice Stern), 325 Pa. 357, 191 A. 43 (1937), where it is held that when a second tortfeasor is aware of the negligence of the first tortfeasor but nevertheless the second actor acts or continues to act in a negligent manner with a resulting accident, this is a superseding cause which relieves the first actor of liability. Regardless of any variation between Kline v. Moyer and the Ohio law

of intervening cause, it is apparent that the Hurt case is exactly in accord with the Pennsylvania law on this point since in Hurt the second actor (truck driver) was actually aware of the negligence of the first actor (shipper) and thereafter the truck driver was himself negligent in performing his duty to repair the boxes to prevent further forgings from falling out. Thereafter, he continued on his negligent way for a distance of forty or fifty miles from Cedar Point, Ohio, to a point just east of Toledo when the resulting and foreseeable accident occurred.

In the instant case, there is no evidence that Stringert, the driver, actually knew of the faulty and inadequate bundling of this piece of steel by Mulach. If Stringert did know and took inadequate and negligent means of remedying the situation, then the conduct would be an intervening or superseding cause under the Hurt case but there is no such evidence. We do hold that Stringert was negligent in his inspection and in his failure to discover the hazardous condition and has not exculpated himself from his duty under exclusive control to secure the load. Therefore, Mulach is not absolved and the negligence of Mulach concurring with the negligence of Stringert for which Balistreri is responsible was a concurrent proximate cause of this accident and the damages sustained by the plaintiffs.

We place no reliance upon Warden v. Lyons Transportation Lines, 432 Pa. 495, 248 A.2d 313 (1969) for the reason that there the trucker was absolved by the jury and the court determined that the evidence of the expert used to hold the shipper liable did not measure up to the standards for expert testimony in Pennsylvania.

We adhere to Section 452(1) of the Restatement of Torts which reads:

"Third Person's Failure to Prevent Harm

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent con-

duct is not a superseding cause of such harm."

We do not find anything in subsection (2) which would remove Mulach from the finding of negligence on its part covered by subsection (1).[2] The comment on subsection (1) clearly makes the negligence of Mulach and the negligence of Stringert concurring causes in this situation.[3]

For these reasons, judgment will be entered against Mulach as a joint and concurrent tortfeasor in this case.

4. Crossclaims between Mulach and Balistreri.

What we have said above with respect to the liability of Mulach Steel and Balistreri is largely dispositive of the crossclaims for indemnity or contribution filed by each of these defendants against each other. Each claims to be only secondarily liable, that the primary negligence was that of the other and hence each claims it is entitled to indemnity from the other if held liable at all. For instance, Balistreri would argue that the primary negligence was that of Mulach Steel in faultily bundling and Balistreri's negligence, if any, consisted only of failure to inspect. Mulach Steel, on the other hand, urges that the primary negligence was that of Balistreri.

We are not unmindful of the Third Circuit decision in Tromza v. Tecumseh Products Co., 378 F.2d 601 (1967). This was a products liability case in which damage occurred where the casing of a compressor unit in a refrigerator exploded while being serviced by a repairman when submitted to a pressure of 170 pounds. A majority of the court held that the manufacturer of the refrigerator was only secondarily liable and entitled to indemnity from the manufacturer of the compressor who was held primarily responsible. It is noted that Judge McLaughlin dissented on the grounds that the refrigerator manufacturer had so changed the compressor that both should be held jointly liable.

The basic case in this area in Pennsylvania is Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319 (1951). There the court described the tests as follows:

" . . . The right of indemnity rests upon a difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable."

\* \* \* \* \* \*

" . . . The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence,—a doctrine which, indeed, is not recognized by the common law. [Citation omitted] It depends on a difference in the *character*

---

2. "Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."

3. "b. Subsection (1) states the rule, applicable in the ordinary case, that the failure of the third person to act to prevent harm to the other threatened by the original actor's negligent conduct, is not a superseding cause of such harm, and so does not relieve the actor of liability for the harm which he has in fact caused. *If the third person is under a duty to the other to take such action, his failure to*

do so *will subject him to liability for his own negligence which is concurrent with that of the actor, for the resulting harm which he has failed to prevent; but his failure to perform his duty does not relieve the original actor of liability for the results of his own negligence.* A fortiori, where the third person is under no duty to the other to take any action, but merely has the opportunity to do so, his failure to act not only does not make him liable, but is not a superseding cause which will relieve the original actor of liability. As to the exceptional cases in which all responsibility has been shifted to the third person, see Comments on Subsection (2)."

or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrong-doers to the injured person." (Emphasis in the original.)

\* \* \* \* \* \*

"Without multiplying instances, it is clear that the right of a person vicariously or secondarily liable for a tort to recover from one primarily liable has been universally recognized. But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible. In the case of *concurrent* or *joint* tortfeasors, having no legal relation to one another, each of them owing the same duty to the injured party, and involved in an accident in which the injury occurs, there is complete unanimity among the authorities everywhere that no right of indemnity exists on behalf of either against the other; in such a case, there is only a common liability and not a primary and secondary one, even though one may have been very much more negligent than the other. The universal rule is that when two or more contribute by their wrongdoing to the injury of another, the injured party may recover from all of them in a joint action or he may pursue any one of them and recover from him, in which case the latter is not entitled to indemnity from those who with him caused the injury."

It is true that the court spoke of "concurrent or joint tortfeasors, having no legal relation to one another" and in the instant case the relationship of shipper and carrier did exist between Mulach Steel and Balistreri. If all we had here was defective bundling by Mulach Steel with a negligent failure to inspect by Balistreri, then we might apply the prin-

ciples of primary and secondary liability, but we must remember that we have held Balistreri liable under the Exclusive Control Doctrine, an entirely different method of fastening liability upon a defendant. We have not held Balistreri liable only for failure to inspect, we have held that he has not carried his burden of exculpating himself from negligence. This negligence could be failure to inspect or it could be failure properly to chain down or otherwise secure with bulkheads and other devices the bundles and pieces of steel after they were entrusted to Balistreri's custody. Balistreri was an independent contractor as respects Mulach and we have held that he has not freed himself from the implications of negligence in performing his duties to the public to make sure that this piece of steel did not fall off its truck and endanger innocent motorists. Mulach Steel likewise owed a duty to the public but it was guilty of a separate act of negligence.

We have held in the Mulach part of this opinion that these parties were concurrent tortfeasors and we here hold that the principles of primary and secondary liability and indemnity do not apply; that the plaintiff suffered damages as a result of the concurrent and joint negligence of these two defendants, that they are joint tortfeasors and each is responsible to the plaintiffs for the whole amounts of their damages.

Under Pennsylvania law, particularly the Uniform Contribution Among Tortfeasors Act 12 P.S. §§ 2082–2089, contribution exists among joint tortfeasors. For this reason, the claims for indemnity between these two parties must be denied but to the extent that each may be required to pay more than his share of these judgments, he is entitled to contribution from the other. The right of contribution, of course, does not arise until one joint tortfeasor is required, as in this case, to pay more than one half. We will, therefore, enter judgments in favor of Mulach with respect to the Balistreri claim for indemnity against it and in favor of Balistreri and Stringert with respect to the claim for indemnity

for Mulach Steel against them. We will, however, enter judgment sustaining each of these defendants' right to contribution to the extent that either may be required to pay more than one half of the plaintiff's judgment.

## C. CONCLUSIONS OF LAW

In the light of the foregoing Findings of Fact and Discussion, we therefore enter the following Conclusions of Law.

1. The court has jurisdiction over the subject matter of this action and of the parties.

2. The plaintiffs in each case have the burden of proving by the preponderance of the evidence negligence on the part of the defendants which was a proximate cause of the accident in question.

3. In Civil Action No. 70–405, plaintiff Denny Leasing Company, Inc. was the owner of the tractor and trailer driven by William Ward at the time of this accident and as such is entitled to recover damages to said equipment resulting in this accident.

4. Defendant and crossclaimant McDan Dav Leasing Corporation was the owner of the equipment driven by defendant David Tomlinson at the time of this accident and duly entitled to recover for damages resulting from said accident.

5. Celanese Coatings Company counterclaimant was the owner of the cargo carried in the Denny Leasing Company Inc. equipment at the time of this accident and in Civil Action No. 71–53 is duly entitled to recover damages to said cargo resulting from this accident.

6. The servants of defendant Tom Balistreri t/a Balistreri Haulers including defendant Ralph Stringert, were at all times involved herein acting as servants, agents or employees of said Tom Balistreri and subject to his control so that any negligence on their part is imputed to Balistreri.

7. The defendant Balistreri, through his servants, agents and employees, is liable for injuries and damages resulting from the fall of the piece of steel in question S–1–J3798 from a Balistreri trailer onto the surface of Interstate 70 under the Pennsylvania Doctrine of Exclusive Control.

8. The defendant Balistreri through his servants, agents and employees was negligent in failing to see that the piece of steel S–1–J3798 was properly loaded, chained down and secured so that it would not fall from his equipment and endanger the rights of other persons operating vehicles on Interstate Highway 70.

9. The servants, agents and employees of Mulach Steel Company were at all times herein involved acting as servants, agents or employees of said Mulach Steel in the course of their business and subject to Mulach's control and the negligence of these employees is imputed to Mulach.

10. The defendant Mulach Steel through its servants, agents and employees was negligent in loading said piece of steel marked S–1–J3798 and fastening the same in a bundle in such manner that it could fall or slide off a trailer of Balistreri on which it was loaded.

11. Defendant Mulach Steel was negligent in failing to properly secure said piece of steel so that the same would not slide or fall off the Balistreri trailer.

12. The defendant Mulach Steel was negligent in failing to warn Balistreri drivers of the presence of said steel upon the load so that the Balistreri drivers, particularly defendant Ralph Stringert, could take proper precautions to prevent the said piece of steel from sliding or falling off the load.

13. The negligence of Balistreri and his driver Ralph Stringert and the negligence of Mulach Steel operated concurrently and jointly to proximately cause the injuries suffered by the plaintiffs including Celanese Coatings Company as counterclaimant.

14. All of the plaintiffs and counterclaimant Celanese Coatings Company are free from contributory negligence.

15. The plaintiffs have not sustained their burden of proving negligence on

the part of defendant McDan Dav Leasing Corporation and its driver David Tomlinson which negligence was the proximate cause of this accident.

16. The defendant McDan Dav Leasing Corporation as crossclaimant for damages to its equipment was free of contributory negligence.

17. The liability of Balistreri and Stringert and the liability of that of Mulach Steel does not represent primary and secondary liability but each is liable as a joint tortfeasor to the plaintiffs and counterclaimant and crossclaimant. McDan Dav and Balistreri are not entitled to indemnity from Mulach Steel nor is Mulach Steel entitled to indemnity from Balistreri and defendant Stringert.

■ 18. As joint tortfeasors Balistreri and Stringert on the one hand and Mulach Steel on the other are each entitled to contribution from the other to the extent that each may be called upon to pay more than one half of the recovery of any plaintiff, counterclaimant or crossclaimant McDan Dav.

19. Judgments and orders of dismissal should be entered in accordance with the attached schedule.

Counsel shall submit within 10 days for approval and entry by the court a form of Judgment Order in accordance with the foregoing Findings of Fact, Discussion and Conclusions of Law and the accompanying Schedule.

## SCHEDULE OF JUDGMENTS AND OTHER ORDERS

1. Ward Estate against Balistreri, Stringert & Mulach Steel (70-404) —$171,000.00.

2. Denny Leasing Company, Inc. against Balistreri, Stringert and Mulach Steel (70-405)—$27,000.00.

3. Verbert against Balistreri and Mulach Steel (71-53)—$15,000.00.

4. Celanese Coatings Company on Counterclaim against Balistreri and Mulach Steel (71-53) $3,000.00.

5. Claims against R. Staggers (71-53) —all claims dismissed and judgment for defendant.

6. Crossclaim of Mulach Steel against McDan Dav Leasing Corporation and Tomlinson—claims dismissed and judgment for defendant. (70-404).

7. Crossclaim of Mulach Steel against Balistreri and Stringert—dismissed as to indemnity with prejudice, allowed for contribution. (70-404).

8. Crossclaims of Balistreri and Stringert against Mulach Steel— dismissed as to indemnity with prejudice, allowed for contribution. (70-404).

9. Crossclaim of McDan Dav against Mulach Steel, Balistreri and Stringert—judgment for crossclaimant against these defendants in crossclaims—$9,907.00. (70-404, 71-53) (See stipulation of November 17, 1971).

10. Ward against McDan Dav Leasing and Tomlinson—Motion to Dismiss granted and judgment for defendants. (70-404).

11. Denny Leasing against McDan Dav (70-405)—Denny Leasing and Tomlinson—motion to dismiss granted and judgment for defendants.

12. Crossclaim of Mulach Steel against McDan Dav Leasing Corporation and Tomlinson—claim dismissed and judgment for defendant. (70-405).

13. Crossclaim of Mulach Steel against Balistreri and Stringert—dismissed as to indemnity with prejudice, allowed for contribution. (70-405).

14. Crossclaims of Balistreri and Stringert against Mulach Steel— dismissed as to indemnity with prejudice, allowed for contribution (70-405).

15. Crossclaim of McDan Dav against Mulach Steel, Balistreri and Stringert—judgment for crossclaimant against these defendants in crossclaims $9,907.00 (70-405) with no duplication of recovery.

16. Crossclaim of Mulach Steel against McDan Dav Leasing Corporation

and Tomlinson—claims dismissed and judgment for defendant (71–53).

17. Crossclaim of Mulach Steel against Balistreri and Stringert—dismissed as to indemnity with prejudice, allowed for contribution (71–53).

18. Crossclaims for Balistreri and Stringert against Mulach Steel—dismissed as to indemnity with prejudice, allowed for contribution (71–53)—crossclaim of Staggers dismissed with prejudice.

19. Third party claims against Celanese Coatings, All States Service Corporation and HAC Farm Lines—all third party claims against these defendants dismissed with prejudice and judgment for third party defendants.

20. Crossclaims of Tomlinson and H. A. C. Farm Lines against Mulach, Balistreri and Staggers—crossclaims dismissed (71–53) with prejudice.

21. Judgment for costs in each case entered against Mulach and Balistreri.